UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Stephen Bain,
               Plaintiff,

      v.                                    Civil Action No. 1:07-CV-116

John Gorczyk, Steven Gold,
Robert Hofmann, James Donnon,
Keith Tallon, Michael O'Malley,
Robert Arnell, David Boulanger,
Raymond Flum, Kevin Oddy,
Christopher Owens, Kathleen
Lanman, Dr. Susan Wehry,
Dr. Cody, Dr. Kern, Dr. Rousse,
Dr. Leppman, Dr. Kutler, Prison
Health Services, Inc., Correctional
Medical Services, State of Vermont,
Vermont Department of Corrections,
John and Jane Doe,
               Defendants.

## <u>REPORT AND RECOMMENDATION</u>
(Docs. 98, 101 and 107)

Plaintiff Stephen Bain, a Vermont inmate proceeding *pro se*, brings this action

claiming that the defendants have violated his constitutional rights and have discriminated

against him in violation of the Americans with Disabilities Act ("ADA"). Specifically,

Bain contends that he has not received adequate medical care while in prison, and that he

was wrongfully denied the opportunity to serve his prison time at a work camp. Bain also

contends that the defendants retaliated against him by transferring him to an out-of-state

facility.

Pending before the Court are two motions for summary judgment filed by the

defendants (Docs. 98 and 101).  The Court has liberally construed Bain's opposition to the summary judgment motions as including a request for discovery sanctions (Doc. 107).  For the reasons set forth below, I recommend that the motions for summary judgment be GRANTED and the motion for sanctions be DENIED.  I also recommend that the Court require any dispositive motions on Bain's remaining claims to be filed on or before April 30, 2010.

## Factual Background

Bain is an inmate under the custody and control of the Vermont Department of Corrections ("DOC").  On August 21, 1998, he received a sentence for a series of crimes that included two convictions for possession of stolen property (receiving 1-10 years on each conviction), one conviction for possession of marijuana (1-3 years), and a conviction for prescription fraud (1-2 years).  He was also sentenced to serve a previously-suspended sentence for possession of stolen property (1-10 years).  The sentences were to run concurrent to each other, beginning on September 1, 1998.  The sentencing court recommended that Bain be allowed to serve his prison time at the DOC's Caledonia Community Work Camp ("Work Camp") in St. Johnsbury, Vermont.

The Work Camp is a minimum security facility that houses up to 100 male inmates.  According to the affidavit of Robert J. Arnell, III, Assistant Superintendent of the Work Camp, the purpose of the Work Camp is to promote and facilitate community-based reparation through community work projects, as well as to prepare inmates for re-introduction back into community life.  (Doc. 102-2 at 1.)  Work performed by inmates at

the Camp includes community jobs such as painting and carpentry, as well as support job (e.g. janitorial and laundry services) at the Camp itself. *Id.* at 2.

To be eligible for the Work Camp, an inmate must be in the Work Camp program not less than six months and no more than one year. The inmate must also be classified at the minimum custody level, have acceptable prison behavior, and be medically cleared. Pre-trial, pre-sentence, and sentenced detainees are ineligible, and inmates who remain incarcerated beyond their minimum sentences are ineligible. For "security and safety reasons," Work Camp participants may not be under the influence of narcotic medications.[1] The DOC's Director of Classification has approval authority for Work Camp eligibility. (Doc. 102 at 2, 4.)

When initially incarcerated in 1998, Bain was given a minimum release date of June 2, 1999 and a maximum release date of March 2, 2006. He was housed at the Work Camp between September 10 and September 18, 1998, and again from October 21, 1998 through December 2, 1998. Arnell's affidavit submits that Bain was removed in September 1998 for medical reasons, and in December 1998 "for his own protection." *Id.* at 3. Due to his time spent at the Work Camp, Bain was awarded 24 days of "earned reduction of term" ("ERT") in 1998. *Id.* at 4.

On April 10, 1999, Bain was released on furlough. On November 15, 1999, after

_____

[1] Bain questions these eligibility criteria, stating that "there were many individuals at the camp with minimum and maximum term[s] of confinement that far exceed the time frames averred in" the defendants' affidavits, and that there was "widespread consumption of illegal drugs by residen[ts]." (Doc. 107-2 at 6). He also claims that these criteria are not in writing, and are therefore not credible. *Id.*

his minimum sentence expired, he was granted parole.  On June 17, 2003, his parole was revoked.

From July 15, 2003 through July 26, 2006, Bain was a sentenced detainee and, according to Arnell, was therefore ineligible for the Work Camp.  On July 26, 2006, he was sentenced as an habitual offender for crimes of possession of marijuana and possession of stolen property, and sentenced to 2-5 years and 5-10 years respectively. The sentences run concurrent to each other but consecutive to his previous sentences.  As a result, his current minimum release date is July 24, 2011 and his maximum release date is February 5, 2013.

After his sentencing in July 2006, Bain asked to be placed at the Work Camp.  At the time, he was taking prescribed narcotics for pain.  According to Arnell's affidavit, "Mr. Bain was informed that he would be considered for Work Camp placement if he agreed to substitute non-narcotic medications for his narcotic ones.  Mr. Bain refused to stop taking his narcotic medications.  As such, he was not considered for Work Camp placement."  *Id.* at 5.  Bain was also ineligible at that time because he was awaiting trial on a petty larceny charge.  That charge was dismissed in December 2006.

Arnell's affidavit further explains that when an inmate has in excess of 27 months remaining on his minimum sentence, as Bain does, he is ineligible for the Work Camp. An inmate whose minimum sentence exceeds 27 months may nonetheless be "pre-screened for eligibility to participate in the Work Camp and if found eligible they are placed on an eligibility list pending entry to into the Work Camp. . . .  The eligibility wait

list for placement at the Work Camp is long, and as a result, many inmates who are qualified for placement at the Work Camp are denied access to the program." *Id.* at 5.

Bain contends that his removal from the Work Camp in 1998, and subsequent refusals to allow him to return, have violated his constitutional rights and his rights under the ADA. Specifically, he claims that he was removed from the camp without due process, and that prison officials should have accommodated his medical needs by allowing him to continue his narcotic medications. In his Statement of Disputed Material Facts, Bain contends that "[f]or the Defendant to suggest Plaintiff should not be eligible for placement at a work camp and that the program would somehow undergo an intolerable fundamental change, or that Plaintiff should have to capitulate indicated effective medical care and treatment to reside at a work camp . . . constitutes discrimination and retaliation based solely upon his disability, . . . ." (Doc. 107-2 at 10.)

Bain also claims in his complaint that he has not received adequate medical care. Like his Work Camp claim, this allegation relates to his use of narcotic medications. In 1985, Bain was involved in a serious automobile accident, suffering spinal and traumatic brain injuries. He underwent spinal surgery in 1986 and again in 1990. He claims that his injuries were exacerbated by subsequent car accidents in 1992 and 2002. As he states in his Statement of Disputed Material Facts, "as a direct result of foregoing Plaintiff suffers from great chronic pain throughout his body as he has for many years . . . . Nevertheless, with proper medical treatment Plaintiff is able to live a relatively normal but not pain-free life." *Id.* at 2.

The defendants have documented Bain's history of medical care and treatment with respect to his pain management, with particular focus on his use of, and requests for, narcotics. The suggestion in their filings is that over the course of several years, Bain has systematically increased his narcotic dosages, and that what he is now calling inadequate care has instead been an effort by health care providers to transition him away from addictive painkillers.

According to Bain's medical records, as reviewed and summarized in the affidavit of defendant Erin Cody, M.D. (Doc. 99-1), between 1997 and 2003 Bain received prescriptions for pain relief from Gary Shapiro, M.D. Those prescriptions included MS-Contin, OxyContin and Methadone. The initial prescription, written in July 1997, was for 15 mg of MS-Contin to be added to a previous prescription of 30 mg each morning. After Bain complained that the MS-Contin might be causing impotence, Dr. Shapiro switched him to OxyContin at 20 mg twice a day. By September 1997, Bain reported taking 50mg of OxyContin three or four times a day to control pain.

In late 1997, Bain returned to Dr. Shapiro twice for medication beyond the amount prescribed, explaining that he suspected a tenant had been stealing his refills. In February 1998, Bain altered one of his prescriptions for OxyContin, increasing the number of capsules from 9 to 19. He later apologized to Dr. Shapiro for his conduct.

In August 1998, Bain complained to Dr. Shapiro of worsening pain in his back. Dr. Shapiro issued a prescription for 1-2 10 mg tablets of OxyContin to be taken every 12 hours. The following week, Dr. Shapiro continued the prescription at 20 mg twice a day.

As noted above, Bain was incarcerated for approximately 9 months beginning in August 1998. Upon his release in 1999, he returned to Dr. Shapiro and complained that he had only been given Tylenol #3 to manage his pain while in prison.

Over the next several months, Dr. Shapiro increased Bain's OxyContin to 20 mg three times a day, and eventually to 100 mg daily. When Bain continued to complain of pain, Dr. Shapiro capped his dosage at 40 mg every six hours. Shortly thereafter, Bain reported to Dr. Shapiro that he was using OxyContin more frequently than prescribed, and that he was also using Valium. Three weeks later, Bain informed Dr. Shapiro that he was taking 40 mg of OxyContin up to five times daily. Dr. Shapiro did not increase Bain's OxyContin dosage, and instead prescribed other pain medication.

In August 2000, Bain complained to Dr. Shapiro that he had run out of medication early, and that the alternative medications were causing negative side effects. Dr. Shapiro refilled the OxyContin prescription, but informed Bain that his medications would only be available every 30 days. According to Dr. Cody's affidavit, during the following months "Dr. Shapiro continued to refill [Bain's] OxyContin prescriptions even though Plaintiff admitted not to using them as prescribed, and Dr. Shapiro continued to note in the records that Plaintiff did not exhibit any pain behaviors." (Doc. 99-1 at 6.)

Bain was again incarcerated in May 2003, and has been in DOC custody since that time. Upon his arrival in prison, he informed a registered nurse that narcotics were a mandatory part of his treatment. He was offered alternative pain relievers such as Paraflax and Ibuprofen, but allegedly refused to take them.

Bain submits in his Statement of Disputed Facts that shortly after his incarceration, he participated in an intake interview with a Physician's Assistant. (Doc. 107-2 at 12). Shortly thereafter, he was transferred to a facility in Windsor, Vermont for further medical evaluation. In July 2003, he was transferred to a facility in Newport, Vermont, and in August 2003 was seen by a Dr. Pederson. According to Bain, "Dr. Pederson was not amenable to according Plaintiff continuity of medical treatment at the prevailing standard of care as prescribed by Dr. Shapiro . . . ." *Id.* at 13.

In January 2004, Mitchell Miller, M.D. noted his concerns about Bain's history of opiate use, and suggested input from a specialist as to whether narcotics were appropriate. In February 2004, Dr. Miller consulted with the Pain Clinic at Dartmouth Hitchcock Medical Center, which made various recommendations including the use of Methadone. Dr. Miller started Bain on 5mg of Methadone three times a day, but after Bain complained of continued pain, later raised the dosage to as high as 40 mg four times a day. (Doc. 99-1 at 8.)

In October 2004, Bain was allegedly caught "palming" his Methadone, and his prescription was discontinued. Bain denies the palming charge. (Doc. 107-2 at 14.) In February 2005, he was evaluated by Rowland Hazard, M.D. at the Pain Clinic. When Bain explained to Dr. Hazard that he did not exercise or use the prison gym, Dr. Hazard recommended physical therapy and a narcotic-free regimen of pain medications such as Acetaminophen. (Doc. 99-1 at 9.)

Bain was subsequently seen by John Leppman, M.D. In his meeting with Dr.

Leppman, Bain stated that his pain required narcotics plus Diazepam. Dr. Leppman, who had also been Bain's treating physician prior to his time in prison, determined, "[b]ased on a review of the chart and input from medical staff about Mr. Bain's responsiveness to Methadone and level of function" that "narcotics and Benzodiazepines were not Mr. Bain's best choices." *Id.*

In 2005, Dr. Abigail Hagler prescribed a low dose of Vicodin at 5 mg twice a day. A few weeks later, a different physician suggested Neurontin, and informed Bain that they would inquire about another evaluation by the Pain Clinic. The record indicates that "[a]t times, Bain refused to take Neurontin." *Id.* at 10.

On June 15, 2006, Bain was evaluated at the Pain Clinic by Dr. Daniel Graubert. Dr. Graubert indicated that the dosages of pain medication Bain was receiving prior to his time in prison were not what he would recommend, and suggested a low to moderate dose of Methadone. Prison doctors agreed to provide Bain with Methadone at 10 mg twice a day. Bain continued to receive this medication until he was transferred out of state in January 2007.

This suit was filed on May 8, 2007, alleging in part that the defendants "have made no efforts to reasonably accommodate [Bain], or his need for medical treatment, for his chronic painful medical conditions." (Doc. 4-1 at 6.) Bain also alleges that he "is not receiving medical care and/or treatment at the standard prescribed by his treating physician in-state . . . ." *Id.* at 7. Further, Bain contends that his transfer out of state to a facility that does not provide narcotics was retaliatory. He seeks compensatory damages

of $2 million, and punitive damages of $ 1 million.

**Discussion**

## I.      Summary Judgment Standard

Summary judgment is warranted when the pleadings, depositions, answers to interrogatories, admissions, and affidavits reveal no genuine issue as to any material fact. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). All facts, inferences, and ambiguities must be viewed in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Initially, the burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party has satisfied its burden, the non-moving party must assert specific facts demonstrating there is a genuine issue to be decided at trial. Fed. R. Civ. P. 56(e)(2); *Liberty Lobby, Inc.*, 450 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. There must be sufficient evidence upon which a reasonable fact finder could return a verdict for the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 248-49; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## II.      Medical Care Claim

The Court will first address Bain's claim that his medical care was inadequate. To show that prison medical treatment was so inadequate as to amount to "cruel or unusual punishment" prohibited by the Eighth Amendment, he must prove that defendants'

actions or omissions amounted to "deliberate indifference to a serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

The Second Circuit has stated that a medical need is "serious" for constitutional purposes if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.1994), *cert. denied*, 513 U.S. 1154 (1995)); *see also Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000) ( "A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' ") (quoting *Chance*, 143 F.3d at 702).  Among the relevant factors for determining whether a serious medical need exists are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance*, 143 F.3d at 702 (internal quotation marks omitted).

As to the "deliberate indifference" prong, the Supreme Court explained in *Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991) that this standard includes both an objective and a subjective component.  With respect to the objective aspect, the Court must ask whether there has been a sufficiently serious deprivation of the prisoner's constitutional rights.  With respect to the subjective element, the Court must consider whether the deprivation was brought about by defendants in wanton disregard of those rights.  *Id.*  To establish deliberate indifference, therefore, Bain must prove that the defendants had a culpable

state of mind. *See id.* at 299.

The U.S. Supreme Court has made clear that mere negligence is not actionable under the Eighth Amendment. "A [prisoner's] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. Rather, the plaintiff must allege conduct that is "repugnant to the conscience of mankind," or "incompatible with the evolving standards of decency that mark the progress of a maturing society." *Id.* at 102, 105-06.

Furthermore, an inmate's "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703; *see also Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977) ("The courts will not intervene upon allegations of mere negligence, mistake or difference of opinion.").

Applying these standards here, the Court should find that there was no violation of Bain's Eighth Amendment rights. The record makes clear that, once incarcerated, Bain received careful and considered treatment with respect to his pain management. This treatment included review of Bain's prescription regimen by doctors both inside and outside the prison system. Specifically, prison doctors consulted with the Pain Clinic at Dartmouth Hitchcock three times between 2004 and 2007. When Dr. Hazard from the

Pain Clinic recommended Neurontin, prison physicians prescribed Neurontin. When Dr. Graubert from Pain Clinic recommended low doses of Methadone, that recommendation was implemented as well.

During the time period in question, the medications used to address Bain's complaints of pain included Methadone, Vicodin, Flexeril, Neurontin and Acetominophen. Bain's care was reviewed regularly, and various approaches were developed that did not involve high levels of narcotics. Indeed, despite Bain's claims to the contrary, more than one physician concluded that narcotics were not his best option. Nonetheless, Bain maintains that he should have received narcotic medications at the level prescribed by Dr. Shapiro prior to his incarceration, and that anything less does not meet the prevailing medical standard.

As discussed above, a claim of negligence does not equate to an Eighth Amendment claim. *Estelle*, 429 U.S. at 106. Moreover, Bain's disagreement with his treatment, and his consistent efforts to obtain higher levels of narcotics, do not render his care unconstitutional. *Id.* at 107; *Chance*, 143 F.3d at 703. There is no indication in the record that any of the defendants acted with deliberate indifference, or even that the care they provided was medically inadequate. Bain's Eighth Amendment claim of inadequate medical care should therefore be DISMISSED.

III.    **Work Camp Claim**

The bulk of Bain's complaint focuses on his desire to serve his time at the Work Camp. The defendants argue that they are entitled to summary judgment because (1) a

private ADA claim for money damages must allege discriminatory animus, (2) Bain has failed to show that he suffers from a disability as defined by the ADA, and (3) Bain was not an otherwise qualified individual.

**A.       Claims For Damages Under Title II Of The ADA**

Title II of the ADA prohibits a state agency such as the DOC from excluding an individual from a program because of the individual's disability.  *See* 42 U.S.C. § 12132. The Supreme Court has held that Title II applies to state prisoners.  *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209-10 (1998).  Before the Court addresses the merits of Bain's claims, it must determine whether the defendants are subject to suit for damages under Title II.

First, it is well established that Title II does not authorize suits against state officers in their individual capacities.  *See Browdy v. Karpe*, 131 Fed. Appx. 751, 754 (2d Cir. 2005); *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001).  Within the realm of Bain's Work Camp claim, all of the defendants are state officials.  Therefore, to the extent that those defendants are being sued in their individual capacities, Bain's claims should be DISMISSED.

The viability of Bain's damages claims against the state defendants in their official capacities, and of his claims against the DOC itself, is "[l]ess amenable to a tidy answer." *Cole v. Goord*, 2009 WL 2601369, at *4 (S.D.N.Y. Aug. 25, 2009).  In general, suits against a state or its employees in their official capacities are barred by the Eleventh Amendment.  However,  Congress may abrogate a state's immunity by making "its

14

intention to abrogate unmistakably clear in the language of the statute," and by acting "pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment." *Nevada Dept. of Human Res. v. Hibbs*, 538 U.S. 721, 726 (2003).

The defendants argue that Bain cannot bring a claim for damages against the DOC or the official capacity defendants without showing discriminatory animus or ill will, a standard first established by the Second Circuit in *Garcia*, 280 F.3d at 111-12. The *Garcia* decision reasoned that "[g]overnment actions based on discriminatory animus or ill will towards the disabled are generally the same actions that are proscribed by the Fourteenth Amendment - *i.e.*, conduct that is based on irrational prejudice or wholly lacking a legitimate government interest." *Id.* Because a ban on this sort of conduct "comport[s] with Congress's § 5 authority," the Second Circuit held that a plaintiff making such a claim could seek monetary damages against the states. *Id.* at 111.

Since the *Garcia* ruling, however, two Supreme Court decisions have called into question whether the "discriminatory animus or ill will" standard is still valid. *See Bolmer v. Oliveira*, 2010 WL 424591, at *12-*13 (2d Cir. Feb. 8, 2010) (citations omitted).. Specifically, in *Tennessee v. Lane*, 541 U.S. 509 (2004), the Supreme Court allowed a private cause of action for damages under Title II where the plaintiff claimed that his right of access to the courts had been violated. Subsequently, in *United States v. Georgia*, 546 U.S. 151 (2006), the Court permitted a private cause of action for conduct that "*actually* violates the Fourteenth Amendment," 546 U.S. at 159 (emphasis in original). In doing so, the *Georgia* decision left it for lower courts to determine,

15

on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

*Georgia*, 546 U.S. at 158-59.

District courts in this Circuit "have come to different conclusions as to whether *Garcia* is still good law in light of *Lane* and *Georgia*." *Cole*, 2009 WL 2601369, at *7 (citing cases). The Second Circuit has not ruled on the question. *See Bolmer*, 2010 WL 424591, at *13 ("Whether or not *Garcia* survives *Lane* and *Georgia*, a question we do not reach . . . ."). This Court, too, should decline to "delve into these deep constitutional waters," since Bain's ADA claim fails for other reasons. *Cole*, 2009 WL 2601369, at *7. I therefore recommend that the *Garcia* standard not be applied in this case, and that the Court proceed to the defendants' other arguments.

## B.    Disability

The defendants next argue that Bain cannot demonstrate that he has a disability as defined by the ADA. The ADA defines "disability" as a physical or mental impairment that substantially limits one or more  major life activities, a record of such an impairment, or being regarded as having such an impairment. 42 U.S.C. § 12102(2) (amended Jan. 1, 2009). "In determining whether an individual has a disability for purposes of the ADA," the Second Circuit has "applied the three-step approach taken by the Supreme Court in *Bragdon v. Abbott*, 524 U.S. 624, 118 S. Ct. 2196, 141 L. Ed.2d 540 (1998)." *Weixel v.*

16

*Board of Educ. of City of New York*, 287 F.3d 138, 147 (2d Cir. 2002).  Under this approach,

> plaintiff must first show that [he] suffers from a physical or mental impairment.  Second, plaintiff must identify the activity claimed to be impaired and establish that it constitutes a "major life activity."  Third, the plaintiff must show that [his] impairment "substantially limits" the major life activity previously identified.  In addition, the Supreme Court has recently clarified that the identified major life activity must be "of central importance to daily life." *Toyota Motor Mfg. v. Williams*, 534 U.S. 184 (2002).

*Weixel*, 287 F.3d at 147 (internal citations omitted).[2]  The term "major life activity" includes "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i).  This is not an exclusive list, however, as the Second Circuit has also included "'sitting, standing, lifting, and reaching'" as major life activities.  *Ryan v. Grae & Rybicki*, 135 F.3d 867, 870 (2d Cir. 1998) (quoting U.S. Equal Employment Opportunity Commission, Americans with Disabilities Act Handbook, I-27 (1992)).

Determining whether or not someone is disabled within the meaning of the statute requires "an individualized, fact-specific analysis."  *Worthington v. City of New Haven*, 1999 WL 958627, at *8 (D. Conn. Oct. 5, 1999) (citations omitted).  To prove disability under this test, an individual must do more than "merely submit evidence of a medical diagnosis of an impairment."  *Williams*, 534 U.S. at 185.  "Instead, the ADA requires

---

[2]  The ADA Amendments Act of 2008 changed the threshold standard for determining whether an ADA plaintiff is disabled.  It has been held that the ADA Amendments Act does not apply retroactively to ADA claims such as Bain's that arose before January 1, 2009. *See, e.g., Lytes v. D.C. Water and Sewer Auth.*, 572 F.3d 936, 941 (D.C. Cir. 2009).

those 'claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by the impairment] in terms of their own experience . . . is substantial.'" *Id.* at 198 (quoting *Albertson's Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999)) (alteration in original).

Bain has not offered any medical testimony in support of his ADA claim. Indeed, his only evidence of his impairments are his own statements. In his response to the motion for summary judgment, he claims that he is "limited in the major life activity of sitting as sitting in one (1) position for any period of time of thirty (30) minutes or one (1) hour or less causes a marked increase in his already great and chronic neuropathic and orthopedic pain." (Doc. 107 at 8.) His complaint admits, however, that "with proper medical intervention, [he] is able to live a relatively normal life." (Doc. 4-1 at 5.)

The Court may take into account fact that Bain's functioning is rendered "relatively normal" by medication. *See Muller v. Costello*, 187 F.3d 298, 312 (2d Cir. 1999) (noting that an alleged disability must be examined "'with reference to measures that mitigate the individual's impairment'") (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 475 (1999)). The Court may also consider the fact that Bain's only evidence of his inability to sit for long periods of time is his own unsubstantiated statement. *See Douglas v. Victor Capital Group*, 21 F. Supp. 2d 379, 392 (S.D.N.Y. 1998) (dismissing plaintiff's ADA claim because his "testimony as to the (alleged) limits on his ability to walk, without supporting medical testimony, simply [was] not sufficient to establish his prima facie case under the ADA.") (citing *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718,

723 (2d Cir. 1994) (dismissing the plaintiff's ADA claim because she failed to submit medical evidence to substantiate her assertions regarding the extent of the alleged disability's impairment)).

With these considerations in mind, the Court should find that Bain has not established a substantial impairment on his ability to sit.  To be substantial, the impairment must prevent him from performing "a major life activity that the average person in the general population can perform [.]" 29 C.F.R. § 1630.2(j)(1); *see also Capobianco v. City of New York*, 422 F.3d 47, 57 (2d Cir. 2005).   "The inquiry is not just on the effect an impairment has on tasks associated with a specific job, but it must focus primarily on whether the claimant is 'unable to perform the variety of tasks central to most people's daily lives.'"  *Capobianco*, 422 F.3d at 57  (quoting *Williams*, 534 U.S. at 200).

Bain concedes that while at the Work Camp, he was able to "fully participate in all work camp activities he was permitted to partake in," including answering telephones and calculating inmates' sentence adjustments.  (Doc. 107-2 at 5.)  When on narcotics, he claims that his life is "relatively normal."  *Id.* at 2.  Notes from Dr. Shapiro, Bain's preferred physician, comment that Bain's requests for narcotics were at times inconsistent with his presentation.  (Doc. 99-1 at 4) ("Mr. Bain showed no pain behaviors . . ."); (Doc. 99-1 at 6) (Dr. Shapiro refilled Bain's OxyContin prescription even though he "continued to note in the records that Mr. Bain did not exhibit any pain behaviors.").  Prison physicians have reportedly told Bain that they would medically clear him to reside at the

work camp. (Doc. 107-2.) Indeed, there is no medical evidence to support Bain's claim of a substantial impairment.

Furthermore, Bain presented this very same disability claim in state court and was unsuccessful. On November 10, 2009, a bench trial was held in Washington County Superior Court. At the close of Bain's case, defendant Robert Hofmann, the former DOC Commissioner, moved for judgment as a matter of law. In granting the motion, Judge Geoffrey Crawford found that

> [v]irtually the only evidence in this case that Mr. Bain's impairment, back pain, limits an important life activity is his own subjective testimony. That testimony is not meaningfully corroborated by medical or objective evidence, nearly all of which suggests that, though he may experience some back pain, he does not suffer a substantial limitation of an important life activity.
>
> . . .
>
> In this case, the element of functionality is not present. There is no objective verification of the plaintiff's complaints. The doctors and nurses who have examined him have consistently noted an absence of symptoms (except as reported) and an ability to walk and sit without signs of discomfort. He has been cleared for sedentary work. When he is not incarcerated, he is active in projects around his home. Mr. Bain's reports of leg pain are not consistent with anatomical nerve distribution. He has been involved in small-scale improprieties involving his pain medication and consistently pushes his physicians to prescribe higher doses. There is insufficient evidence in Mr. Bain's presentation of his case to support a finding that he suffers from a physical impairment that substantially limits a major life activity.

*Bain v. Hofmann*, Docket No. 810-12-07 Wncv, at 6-7 (Vt. Sup. Ct. Washington County, Dec. 15, 2009).

Claim preclusion "prevents parties from relitigating issues in subsequent litigation

that were or could have been litigated in a prior action." *Kesten v. Eastern Sav. Bank*, 2009 WL 303327, at *3 (E.D.N.Y. Feb. 9, 2009) (citing *Allen v. McCurry*, 449 U.S. 90, 94 (1980)). A federal court is required to give the same preclusive effect to a state court's treatment of an issue as the law of that state requires. *Jenkins v. City of New York*, 478 F.3d 76, 85 (2d Cir. 2007); *see Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984) ("It is now settled a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered."); 28 U.S.C. § 1738. In Vermont, the doctrine of collateral estoppel "bars the subsequent relitigation of an issue which was actually litigated and decided in a prior case between the parties resulting in a final judgment on the merits, where that issue was necessary to the resolution of the action." *Sheehan v. Dep't of Employment & Training*, 169 Vt. 304, 308 (1991). Those elements are present here, as Bain has clearly litigated the question of his disability in state court, a final judgment was rendered, and the question of disability was necessary to resolution of the action.[3] The Court should therefore find that, given both the evidence in this case and the fact of the state court judgment, Bain has not shown that he is disabled under the ADA.

## C. "Regarded As" Disabled

In addition to his claim of disability, Bain alleges that he was "regarded as"

---

[3] The Second Circuit has upheld a district court raising collateral estoppel *sua sponte* without giving the opposing party an opportunity to respond. *Curry v. City of Syracuse*, 316 F.3d 324, 330 (2d Cir. 2003) (discussing *Doe v. Pfrommer*, 148 F.3d 73, 80 (2d Cir. 1998)). If Bain wishes to respond to the use of claim preclusion in this case, he may do so in his objection to this Report and Recommendation.

disabled by DOC officials. (Doc. 4-1 at 10); (Doc. 107-2 at 7.) In order to prevail on a "regarded as" claim, he must show that the DOC "mistakenly believes that a person has a physical impairment that substantially limits one or more life activities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). To support this claim, Bain alleges that while at the Work Camp "he was instructed not to as much as pickup [sic] a broom to sweep the floor or a mop to wipe the floor. . . . [H]e was not allowed to go outside of the fence to work or participate in any other physical activity at any time as others did. Plaintiff was advised that the Defendant did not want him to hurt himself doing any form of physical activity or labor. The Department of Corrections clearly identified, regarded and treated the Plaintiff as being disabled." (Doc. 107-2 at 7.)

The defendants' evidence submits that Bain was removed from the Work Camp twice, once for "medical reasons" and once "for his own protection." (Doc. 102-2 at 3.) Robert Arnell states that Bain would have been considered for Work Camp placement in 2006 and thereafter if he had agreed to replace his narcotic medications with non-narcotics. This latter evidence suggests that the DOC was not denying Bain access to the Camp based upon a disability, but instead upon his continued reliance on narcotics. As discussed above, numerous physicians, including those at Dartmouth Hitchcock Medical Center's Pain Clinic, have determined that narcotics are not Bain's best medical option. If Bain had to acceded to those doctors' recommendations, it appears likely that the DOC would have considered him for Work Camp placement.

At most, Bain is claiming that the DOC treated him as unable to work. When the

major life activity is work, a plaintiff must "allege that [he is] unable to work in a broad class of jobs." *Sutton,* 527 U.S. at 491. Bain was barred from the Work Camp because he would not give up his narcotics. Accordingly, he was not barred from an entire class of jobs, but instead from jobs at the Work Camp specifically. As the Vermont Supreme Court has aptly stated:

> It is not, in the instant case, a matter of an individual being precluded from a wide variety of jobs because the medical condition is aggravated by a factor common to the workplaces where the jobs are . . . . Rather, the individual is precluded from a wide variety of jobs because he is in prison having been convicted of a crime. . . . As such, plaintiff's choice of work sites may be limited, but the limitation is not a factor of his medical condition, it is a factor of his incarceration.

*Charbonneau v. Gorczyk*, 176 Vt. 140, 144 (2003).

In sum, the DOC was well aware of Bain's chronic pain complaints, and of his alleged limitations. Nonetheless, the DOC placed him at the Work Camp twice. Although he was subsequently removed, the evidence does not support a claim that his removal was the result of the defendants regarding him as substantially limited in one or more major life activities. Moreover, Bain was denied access to the Work Camp, at least in part, because he refused to forego his narcotics. I therefore recommend that the Court dismiss any claim that he was regarded as disabled and, as a result, was the victim of unlawful discrimination.

## D.    Otherwise Qualified

The defendants further argue that Bain was not "otherwise qualified" to serve his time at the Work Camp. One of the elements of a prima facie case under the ADA is a

showing that the plaintiff was otherwise qualified to perform the essential functions of the job with or without reasonable accommodations. *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004).

Here, Bain wanted to be placed in the Work Camp, yet the Work Camp did not allow the use of narcotics. The defendants have submitted two affidavits attesting to the existence of a narcotics ban. (Doc. 102-1 at 1); (Doc. 102-2 at 5.) Bain contends that the defendants' statements should be disregarded because the Work Camp's narcotics ban is not in writing. (Doc. 107-2 at 6.) He also claims that there was "widespread consumption of illegal drugs" by Work Camp residents. *Id.* Neither of these assertions directly counter the sworn statements submitted by the defendants. Indeed, given this evidence, no reasonable juror would doubt the existence of a ban on narcotic use at the Work Camp. Accordingly, to the extent that Bain wanted to be assigned to the Work Camp while on narcotics, he was not "otherwise qualified."

## IV.    Remaining Substantive Claims

Bain's complaint includes allegations beyond his Eighth Amendment and ADA claims. Among these is an allegation that, after he raised the ADA issued, he was transferred out of state in retaliation. (Doc. 4-1 at 6.) Bain alleges that the transfer was retaliatory in that it involved a long bus ride "in chains, shackles and 'Black Box,'" and that the facility to which he was transferred did not allow "the dispensing of narcotic pain relieving medication." *Id.* The defendants have not addressed these claims. I therefore recommend that this case not be dismissed in its entirety, and that the Court require any

24

further dispositive motions to be filed on or before April 30, 2010.

## V.    Motion For Sanctions

In his opposition to the defendants' motions for summary judgment, Bain contended that the defendants had not yet responded to his outstanding discovery requests. For relief, he asked the Court to withhold any decision on the summary judgment motions "until such time as the Defendants have fully complied with the present-day order of this Court and provided Plaintiff with any and all requested discovery . . . ." (Doc. 107 at 2.) He also asked the Court to "employ sanctions" against the Defendants. *Id.* at 43.

Although Bain may not have received the requested discovery when he submitted his opposition papers on September 18, 2009, the defendants served discovery responses on September 8 and again on September 15, 2009. Supplemental responses, consisting of Curriculum Vitaes for Dr. Audrey Kern and Dr. Michael Rousse, were served on September 24, 2009. If Bain needed to supplement his filings after receiving the defendants' discovery responses, he has had several months in which to do so. The Court has not received any supplementation, and should therefore proceed with the summary judgment motions. Bain's motion for sanctions (Doc. 107) is DENIED.

### Conclusion

For the reasons set forth above, I recommend that the defendants' motions for summary judgment (Docs. 98 and 101) be GRANTED. Bain's motion for sanctions (Doc. 107) is DENIED. Because the defendants' arguments at summary judgment do not

address all of the claims set forth in the complaint, I recommend that the Court require any further dispositive motions to be filed on or before April 30, 2010.

Dated at Burlington, in the District of Vermont, this 19th day of February, 2010.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within 14 days after service by filing with the clerk of the court and serving on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See* Local Rules 72(a), 72(c), 73; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a) and 6(d).